[File No. 7022]

ROY H. KERN, Respondent, v. CHARLES KELNER, Appellant.

(27 NW2d 567)

Opinion filed March 6, 1947. Rehearing denied May 28, 1947

*Theo. B. Torkelson,* for appellant.

*Mark H. Amundson* (*Mackoff, Kellogg & Muggli* on Petition for Rehearing) for respondent.

BURR, J. This is an action for specific performance of a written contract wherein the plaintiff was given an option to buy the land hereinafter described. The trial court found for the plaintiff and the defendant appealed demanding a retrial in this court.

Fundamentally the determination of one major fact settles the dispute. In December 1930, the defendant loaned to the plaintiff $3000 and obtained his promissory note for this amount due in one year with interest at 8%. The plaintiff had the note signed by his father and his mother, as joint makers. Owing to the financial condition of the plaintiff the defendant made little attempt to collect the money due, no part was paid and the statute of limitations ran against suit. From time

to time thereafter defendant tried to induce the plaintiff to make payments on the note but it was not until November 30, 1940 that the parties came to an agreement. At that time the debt amounted to over five thousand dollars and on November 30, 1940 the plaintiff gave to the defendant his note for three thousand dollars due November 30, 1942, with interest at the rate of 2% per annum payable annually, the interest not paid when due to bear interest at the same rate.

On November 28, 1941, the defendant, being the owner of the land involved, entered into a written contract with the plaintiff for the renting of this land to the plaintiff "during the season of farming in the year 1942 and subsequent years as hereinafter provided." This contract contains the common, usual printed provisions of such contracts between landlords and tenants to the effect the tenant was to furnish all of the power and machinery necessary and farm in a good and husbandlike manner "and not to sell or remove . . . any of the produce of said farm . . . of any kind . . . until division thereof, without the written consent of the" defendant "and until such division the title and possession of all hay, grain, crops and produce raised, grown or produced on said premises and proceeds of each of the same, shall be and remain in the defendant." Through some oversight this last provision with reference to the title and possession of the crops is omitted from the copy of Exhibit A, attached to the transcript, but it is a part of the instrument Ex. A signed by the parties to this action. The quotations are from the contract, Ex. A.

The defendant had the right to hold any portion of the crop that would belong to the plaintiff in case the latter should fail to fulfill his contract, in order to reimburse the defendant for any payments he was required to make, and one of such payments was the hail lien hereinafter mentioned. The contract further contains this very significant paragraph:

"It is further understood and agreed between the parties that whereas the said party of the second part is indebted to the party of the first part upon a promissory note of three thousand dollars, dated the 30th day of November, A.D. 1940, with in-

terest thereon at the rate of two per cent per annum, all of the crops to be raised by the party of the second part upon the said premises each year during the life of this contract shall be delivered to the order of the party of the first part at the Scranton Equity Exchange at Scranton, North Dakota; that the value thereof shall be determined as of the market price thereof on the 1st day of October of the year in which delivered, unless otherwise agreed upon by the parties hereto; and of the proceeds so to be determined, the one-fourth shall be considered as rental due the party of the first part for the use of the said land, and the remaining three fourths thereof shall be applied toward the payment of the said promissory note of three thousand dollars hereinbefore mentioned and the interest thereon, until the same shall have been fully paid; and in consideration of the premises, the party of the first part hereby grants to the party of the second part an option to purchase the said premises from the party of the first part for the sum of twelve hundred fifty-eight dollars and 85 cents; which option may be exercised within one year after the said note shall have been fully paid, but not otherwise:"

In this contract the plaintiff is the party of the second part and the defendant is the party of the first part. The foregoing phrase "in consideration of the premises" means in this case in consideration of all the antecedent conditions and obligations of the contract.

On the day this contract was executed the plaintiff paid two hundred dollars upon the said note, sixty dollars of which was applied upon the interest, and credit was given the plaintiff for one hundred forty dollars reducing the principal to $2860.

In 1942 the plaintiff raised a crop of 2527 bushels and 20 lbs. of wheat on the land. This is the plaintiff's own allegation. Under the terms of the contract the defendant had title to all of this grain, but it was his duty to credit three fourths of the value of said crop as determined by the price of wheat on October 1, 1942, upon the note in question unless the plaintiff owed him anything under the farming operations. There was but one item which the plaintiff owed—a hail lien mentioned

later. However, the defendant had the right to retain for himself 631 bushels and 50 pounds of wheat. The title to this was in the defendant, and this grain was in fact the rent. The value of the grain on the first day of October 1942, as found by the trial court and not disputed by either party was 95¢ per bushel, and for convenience we call the amount of wheat to be credited 1896 bushels.

There was no crop matured in 1943, owing to hail but the record shows the plaintiff had the crop insured against hail and there was a hail lien impressed upon the land and all of the crop to be raised in 1943, amounting to $57.60. The plaintiff admits he owed this and on the trial of the case he agreed this should be collected by the defendant out of this 1942 crop.

Disregarding the hail debt as not an advance for the 1942 crop this would require the defendant to give the plaintiff a credit of $1801.20 approximately on the principal and interest of the note, if the plaintiff had complied with his contract in turning over to the defendant all of the crop of 1942. The defendant received but 2053 bushels at that time. He deducted one fourth of the entire crop as rent from this wheat and gave the plaintiff as credit upon the note $42.90 for interest and $1249.60 on the principal. These are defendant's endorsements on the note.

The record shows that when the crop of 1942 was ready to be harvested the parties had a discussion in regard to the place of delivery of the grain owing to the fact that the Scranton Equity Exchange elevator could receive no more grain. The parties were discussing the place of delivery and it was agreed that the plaintiff should deliver the grain in Scranton in a storage bin which the defendant owned there; and if all of the grain could not be delivered there the remainder was to be delivered to the defendant in a granary upon the plaintiff's land. We use the term delivery because of the terms of the contract though one of the elements of dispute is the apparent contention of the plaintiff that no portion of the grain was delivered to the defendant in 1942, and that no delivery took place until the year 1943 because the wheat was not sold till that time.

In the fall of 1942 the plaintiff stored in the defendant's bin in Scranton over two thousand bushels of grain, the amount not being known at the time of delivery, but owing to the fear the bin was not strong enough to hold a larger quantity he stored the remainder in his granary on his own place. However, at that time the defendant was entitled to one fourth of all this grain raised as rent and was entitled to the remaining three fourths to apply on plaintiff's indebtedness to him. If a portion of the remaining three fourths was not necessary to satisfy the note that remainder would belong to the plaintiff.

The defendant did not see fit to sell the grain in the fall of 1942, and retained the portion in his storage bin until the latter half of 1943. At that time he transferred the grain and sold it to the Scranton Equity Exchange, receiving $1.14 per bushel therefor, and for the first time both parties learned the amount of this grain was but 2053 bushels. There is no dispute about this. This remainder was the defendant's grain but was in the plaintiff's granary.

In the fall of 1943 (the plaintiff says sometime prior to November), the plaintiff hauled into Scranton Equity Exchange some of this grain that was left if not all of it, and sold it himself receiving $1.34 per bushel therefor. He was not authorized to sell this grain and the defendant did not know of the sale until some time later. However, the grain had been delivered to the defendant in the fall of 1942, and therefore the plaintiff would have been entitled to credit on his note for the remainder of the crop, 474 bushels of grain, at 95¢ per bushel. However, on November 20, 1943, the plaintiff drew his check on the First National Bank of Bowman for $478.58 and another check on the same date for $473.05, or $951.63 in all, which checks he tendered the defendant, the former as "payment on principal of note" and the latter as payment of the "balance on principal, also Int. and Hail tax." (Quotations from his checks.) He then on the same day drew another check on the First National Bank of Bowman for $1258.85 which he described as "payment in full for land." These checks were placed on a desk for the defendant and in his presence; but defendant said the amount

was not enough. He did not refuse them on the ground that they were checks. The plaintiff then took them, and later produced them on the trial.

Though there was no crop in 1943 the plaintiff raised a crop on this land in 1944. On the trial the defendant attempted to show the amount and the nature of the crop, but objection thereto made by the plaintiff was sustained by the court. However, there is no dispute but what a crop was raised on the land.

In March 1945, the plaintiff served the following notice upon the defendant.

"Scranton, North Dakota
March 29, 1945.

Mr. Charles Kelner,
Buffalo Springs, North Dakota
Dear Sir:

You will please take Notice that I have today deposited to your credit in the First National Bank of Bowman, North Dakota, the sum of $2210.48 in full payment of the land hereinafter described, in full payment of that certain contract entered into by and between you and the undersigned November 28, 1941, and in full payment of that certain note made, executed and delivered by the undersigned to you, November 30, 1940 in the sum of $3,000.00 with interest at 2% per annum. Also 118 bu. 35 lbs. of wheat at the Scranton Equity Exchange

And I hereby demand the conveyance by you by good and sufficient deed of the following described land situated in the County of Bowman and State of North Dakota, to-wit:

The Southwest quarter (SW¼) of Section Four (4) in Township One Hundred Thirty-one (131) North, of Range One Hundred (100) West of the Fifth Principal Meridian.

Yours truly,
Roy Kern
Roy Kern."

The deposits were made as stated in the notice.

We have already set forth the special provision of the contract dealing with the application of the proceeds of three fourths of the crop upon the three thousand dollar note by the defendant. In examining the contract, Ex. A., we note that this provision is typed into the usual printed form contract. It is not a case of small print and small type that could be overlooked. It was an agreement entered into between the parties after deliberation. This action was commenced in May 1945. All of the 1942 crop amounting to 2527 bushels and 20 pounds belonged to the defendant. There was no agreement between the parties as to the change of basis of calculation of value, therefore the defendant calculated the value at the going price on October 1, 1942, being the year of delivery. It seems to be the contention of the plaintiff that there was no delivery of the crop at that time; but he ignored the fact that the crop belonged to the defendant. Assuming the defendant got every bushel of that grain to apply on the indebtedness, other than what he retained for the rent, the utmost that he was required to credit therefrom on the note at 95¢ per bushel would not pay the indebtedness. The contract is one and indivisible. The plaintiff so agreed and the defendant had the right to insist on fulfillment according to the terms. The land was his.

The controversy turns upon the right of the plaintiff to exercise this option. On the trial of the case the court found the plaintiff had not deposited a sufficient amount of money to pay the defendant for all of the crop raised in 1942, and to pay for the rent, and required the plaintiff to make a further deposit exceeding $200.00 to be paid into the court for the benefit of the defendant. Thus, it is clear that when the plaintiff brought this action he had not paid the note in full. Even with extra tender of money the trial court found he had not paid in full and it is clear from the facts, as we find them, that the note never was paid in full even with the deposits. Plaintiff testified he figured the value of the crop at $1.34 per bushel, the price he received for the portion of the crop he sold in 1943.

The option given the plaintiff by the defendant could not be

exercised by the plaintiff until after the note had been fully paid. It could not be otherwise exercised. After the note was paid in full the plaintiff had one year in which to exercise his option.

The court proceeds on the theory that this is an equitable action, and in his memorandum opinion the court shows his basis for his conclusions and his judgment. The court proceeds on the theory that the defendant had no right to sell any of the grain except the amount he was justified in keeping as rental under the contract and that the note given was for "an old obligation, which did not arise as an advance under the contract." The court held therefore that it was in fact a mortgage. The court in his memorandum opinion finds that there was due the defendant on the note $2976 and due the defendant on the hail tax $57.60. The court explicitly finds, "the tender, therefore, was insufficient, the note was not paid and continued to bear interest." The court states, however, "Plaintiff's failure to perform was only partial but he made an earnest effort." The court says further, "There is no proof that defendant ever received" the 118 bushels; but holds, "This is an equity case and since defendant may be fully compensated the contract should be enforced."

This court has held on several occasions that:

"An option to purchase property is a mere privilege given by the owner to the optionee and does not constitute the optionee a purchaser of said property nor give him any right to or interest in the property until he accepts that privilege by exercising his right of option within the time specified and before it is cancelled."

See Larson v. Wood, ante, 9, 25 NW2d 100; State v. Crum, 70 ND 177, 292 NW 392.

It will be noted that even if the defendant had sold all of the three fourths of the 1942 crop at $1.34 per bushel the receipts would not have paid even the principal of the note in full, without considering interest due or the payment of the hail lien; for the principal on the note after the payment made in November 1941 was $2860 and three fourths of the crop at $1.34 would

have amounted to only $2540 without interest. Doubtless it is for this reason the plaintiff attempted to supplement this amount, and the trial court permitted him to do so.

The contract was still in existence. The plaintiff was farming the defendant's land under that contract. While we do not know the amount of the crop of 1944 there is no contention on the part of the plaintiff that he turned that crop over to the defendant in accordance with the contract.

When he made his alleged tender and deposited the same in the bank it was long after the 1944 crop matured. The burden of proof is upon the plaintiff to show that he performed the contract in accordance with its terms before he could exercise his option. He had not paid the note in full. We do not know what was the amount of the grain raised in 1944 nor its value on the first day of October 1944. All we know is that there was a crop raised and that crop was the defendant's crop as up to that time at least the note had not been paid in full. In his answer the defendant prays that "the said option granted to the plaintiff to purchase said land be cancelled and terminated . . . ." This we cannot do. The contract is still in effect. It is one and indivisible with three main provisions:—First, deduction of one fourth of each year's crop as rent; Second, the application of three fourths of each year's crop on the note, or as much thereof as may be necessary until the note is paid, thereafter the three fourths of the crop is delivered to the tenant; Third, within one year after satisfaction of the note and of the rent due, the plaintiff may exercise his option.

The plaintiff cites the case of Minneapolis Iron Store Co. v. Branum, 36 ND 355, 162 NW 543, LRA1917E 298, in support of his theory and of the theory of the court that all of the interest the defendant had in the crop was that of mortgagee because the parties were landlord and tenant. We held therein the relationship was that of landlord and tenant. That issue is not involved here. The parties are in the relationship of landlord and tenant. But that relationship does not prevent the parties from contracting as they see fit with reference to the crops to be raised under such relationship. We set that forth in Mer-

chants' State Bank v. Sawyer Farmers' Co-op. Asso. 47 ND 375, 182 NW 263, 14 ALR 1353. Therein we say,

"The rights of both the landlord and tenant are measured by the terms of their contract. And such rights will be recognized and enforced not in derogation of but in harmony with each other."

We say further in the body of the opinion:

"We are not concerned with a situation where, by provision in a lease, it is sought to reserve title in the landlord to certain personal property, such as furniture or appliances, which the tenant has brought upon the premises. We are concerned only with a situation where the owner of land, in contracting with another for its use, expressly stipulates that title and possession of all crops produced shall be and remain in the owner of the land. The right to so contract has frequently been upheld, and, so far as we can ascertain, has never been denied.

"It is a well-settled principle of law that 'the ownership of realty carries with it as an incident thereto the prima facie presumption of the ownership of both the natural products of the land, such as grass and trees, and the emblements, or annually sown crops, but such presumption is not conclusive. And the owner of land may, in parting with the use of it to another, make such conditions and reservations in relation to the land itself or to the products growing from it as he chooses, instead of parting with the full right.' 17 CJ 381. And where the owner of land, in parting with the use of it to another, stipulates that the legal title, control, and possession of all crops shall be in him for certain purposes, that stipulation is entitled to be enforced so as to carry out the intention and purposes for which it was made."

The respondent insists strongly that so far as the right of the defendant to the crops is concerned the relationship created was that merely of mortgagee and mortgagor and that such relationship is prohibited by statute, citing § 35–0501 Rev Code, which provides: "Mortgages on growing and unharvested crops are prohibited, and any such mortgage shall be void."

This contention was upheld by the trial court. The trial court held in effect that this provision in the contract with reference to crops wherein title was reserved by the landlord created "a lien upon all of the grain to secure the defendant in receiving his full one-fourth share of the crop and any advances (of which there were none)." In support of this contention the trial court cites these two cases heretofore mentioned. The respondent overlooked the fact that the contract was not merely a reservation of a right by the landlord to an interest in the tenant's share of the crop. It was an agreement wherein the landlord was the owner of the crop. In 1941 the legislature enacted a statute (§ 47–1603 Rev Code) dealing specifically with the provision "reserving title to all or any part of the crops in the lessor until the conditions of the lease have been complied with by the lessee and a division of the crop is made" and specifically provides that in order to render the *"reservation of title effective* as to subsequent purchasers or incumbrancers of the lessee" the lease must be filed in the office of the register of deeds, etc. This statute recognizes that the interest of a landlord may be more than that of a mere lien. It is a reservation of title.

We have already noted that the special provision in this contract providing that the three fourths of the defendant's crop which was to be applied upon the note was typed into the written contract and was an agreement entered into between the parties after deliberation. If there were any grounds for claiming ambiguity or possibility of conflict between the printed words and the typewritten words the latter would control as showing the deliberate agreement of the parties.

This contract, as we have shown, is one and indivisible. It provides for the sale of the land at the option of the plaintiff and makes provision for the payment thereof as well as for this pre-existing debt. The interest of the landlord here is not that of a mere mortgagee. The crop is his until the debt is paid. Consequently there was no conversion by the defendant as claimed by the plaintiff. Defendant could not convert his own crop.

Since there was no conversion and thus the value of the crop is to be determined on the first day of October of the year of delivery, and as it belonged to the defendant, it was the duty of the tenant to turn over the grain immediately.

When the plaintiff undertook to pay up his note and put a deposit in the bank he had not given his landlord the crop of 1944. He was not fulfilling the terms of the contract for the contract was still in existence. Had he delivered the crop of 1944, the defendant would have one fourth thereof for rent, would credit the plaintiff on the note for whatever was necessary to pay up the note and then would deliver the remainder of the three fourths if any to the plaintiff. It must be noted that whatever the plaintiff offered the defendant in the fall of 1943 was not sufficient to pay the note. The checks were not accepted by the defendant and no deposit in the bank was made as to the full amount necessary to pay the note. Hence, no legal tender of any amount was made or attempted to be made until March 1945, and after the 1944 crop which belonged to the defendant was raised. The record indicates this 1944 crop was kept by the plaintiff. As pointed out this action is one in specific performance based upon an attempt to exercise the option. But the time in which the plaintiff could exercise his option had not commenced when the action was begun nor had the right accrued at the time of trial and it is clear the plaintiff never accounted for the 1944 crop.

Before the plaintiff can demand specific performance he must show he paid the note in full, and thereafter he exercised his option within one year. This he has failed to do.

The judgment is reversed and the case is remanded for further proceedings in conformity with law.

CHRISTIANSON, Ch. J., and NUESSLE, BURKE and MORRIS, JJ., concur.

BURR, J. (on petition for rehearing). The respondent has filed a petition for rehearing and therein asserts that on the argument on appeal this court "was not advised of the effect

of Chapter 151 of the 1933 Session Laws on the lease involved, which statute provides that:

'It shall be unlawful for any person, firm, corporation or association to solicit or procure bills of sale, *or transfers of whatever nature,* for the purpose of *obtaining title* to, or liens upon growing crops for the year 1933, and thereafter in circumvention of the Crop Mortgage Law . . . .' The reason we believe this was not considered by the Court is that this section was not mentioned either in the memorandum opinion of the trial court nor in the decision of the Supreme Court nor in the briefs or arguments of counsel, . . . ."

He also urges that the "reservation of title in the printed form applied only to indebtedness due. Therefore the landlord had no interest or title to tenant's share of the crop under this provision but acquired whatever right or interest he had in such crop solely under the typed-in provision in the contract, which did not contain a reservation of title . . . ."

In the opinion we specifically refer to the "crop mortgage law" as it is set forth in § 35–0501 of the Rev Code. Chapter 151 of the Session Laws of 1933 purports to supplement and strengthen the "Crop Mortgage Law enacted by the people . . . at the primary election in June 1932" in this that it makes it a misdemeanor "to solicit or procure bills of sale or transfers of whatever nature, *for the purpose of obtaining . . . liens upon growing crops* for the year 1933, and thereafter, *in circumvention of the Crop Mortgage Law* passed by the people of North Dakota on June 29, 1932." The 1939 amendment is of no moment here.

Section 1 of this Chap 151, from which this quotation is taken is set forth in § 35–0503 of the Rev Code and other sections; but these sections must be considered together and as affected by subsequent legislation. This "Crop Mortgage Law" provides in § 2:

"That all mortgages on growing and unharvested crops are abolished, and that any and all mortgages on growing and un-

harvested crops hereafter taken shall be held null and void and of no effect."

It will be noted that Ch 151 refers only to the taking of liens *for the purpose of circumventing the law against crop mortgages.*

This instrument under consideration, Ex. A., does not purport to be a crop mortgage nor is it a crop mortgage.

It is lawful for the parties to such a contract as the one involved to contract as they see fit with reference to the title to the produce of the land; (Angell v. Egger, 6 ND 391, 71 NW 547) and the stipulation reserving the title to the crops in the appellant does not, in itself, constitute a chattel mortgage. McFadden v. Thorpe Elevator Co. 18 ND 93, 118 NW 242. Neither does it divest the respondent of any rights he had under this contract, as the various provisions became discharged.

Respondent could not give a crop mortgage on this crop of 1942 to defeat appellant's rights. It would be useless for respondent to give the appellant a crop mortgage to secure the debt he owed the latter, for the crop raised in 1942 was not respondent's crop, at least so long as the indebtedness was unpaid, even though he might have had an equitable interest in any surplus of the three-quarters, if such surplus existed. There was nothing to divide until the debt was paid. After that, if respondent farmed the land, he could insist on division according to terms.

The 1942 crop was as much the crop of the appellant as if the latter had hired the respondent to sow and harvest it. The parties made a deal whereby, in actuality, the respondent farmed this land and was paid for his work by crediting on his indebtedness the value of services which, in each year until the debt was paid, amounted to the value of three-fourths of the crop as ascertained on the first day of October, unless the parties agreed on another date.

These laws cited do not prevent a vendor and vendee from making such a contract with reference to the sale of land, the farming of land, payment for services, etc., as they see fit.

We have shown already how this instrument involved and termed the farm contract is one and indivisible. It is not only a contract whereby a debtor may pay his debt by farming appellant's land, but it is also an instrument providing for the sale of the land under certain conditions; yet even if Ex. A. be designated a farm lease, and portions thereof construed as such, Chap 5 of SL of 1941 recognizes that a farm lease may contain a provision reserving title to all of the crops "in the lessor until the conditions of the lease have been complied with by the lessee and a division made of the crop . . . ." In the main opinion we refer to this Chap 5 of SL 1941, which is as follows:

## "FILING OF A FARM LEASE

An Act to Require the Filing of a Farm Lease Containing a Reservation of Title to Crop in the Lessor and Providing for a Waiver of Rights by the Lessor Upon Failure to File Such Lease.

## BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF THE STATE OF NORTH DAKOTA:

Sec. 1. (Filing Farm Lease Containing Reservation of Title to Crop: Waiver of Rights on Failure to File.) When a lease of a farm contains a provision reserving title to all or any part of the crops in the lessor until the conditions of the lease have been complied with by the lessee and a division made of the crop, such lease must be on file in the office of the register of deeds in the county in which the lands described in such lease are located prior to July first in the years in which the crops are raised to render such reservation of title to crops effective as to subsequent purchasers or encumbrancers of the lessee of the grain raised upon the lands described in such lease. The failure to file such lease or contract in accordance with the requirements of this section shall constitute a waiver by the lessor of all rights reserved by him in such crops as against any subsequent purchaser or encumbrancer of the lessee. This Act shall not be operative until January 1st, 1942.

Approved March 14, 1941."

Part of this statute is found in § 47–1603 Rev Code. The title is not quoted and at the time of codification the date of effectiveness had no significance so far as this case is concerned; but we cannot appreciate the full import of § 47–1603 of the Rev Code without consideration of the entire act.

By the enactment of this statute the legislature recognized that theretofore such reservation of title was valid as against the world. Thereafter, when the law became operative, the lessor, to protect himself against subsequent purchasers or encumbrancers in good faith, would be required to have his contract on file. However, as between the parties the right of reservation of title in the lessor still remained good without filing.

The statute expressly provided that this limitation of the lessor's right did not become operative until January 1, 1942. This delayed application of provision for filing is further evidence of such legislative recognition.

It is significant the title to this act (Ch 5 SL 1941) recognizes that such reservations were valid without filing, for the title outlines the purpose and indicates the intent is to restrict the lessor's right against third parties only, a right already in existence. It was enacted March 1941, and continues this right without restriction until January 1, 1942. Thereafter failure to file is a waiver by the lessor of such rights; but only as against subsequent purchasers or encumbrancers in good faith of the lessee. The statute does not make a reservation of title void.

In so far as § 47–1604 of the Rev Code is concerned it is clear it deals only with situations where there is nothing in the contract with reference to the products of the land. This latter section cited provides: "The products received from real property during the term of a lease belong to the lessee." That does not prevent the parties from agreeing otherwise. The lessee may waive that right and be a party to a contract governed by § 47–1603.

This law was in effect when the crop of 1942 was sown. If the lessor failed to file the instrument, his interest, and his

alone, is the interest affected even if we construe Ex. A. merely a lease so as to make the relationship that of landlord and tenant only.

The contract does not pretend to be a mortgage of respondent's interest, and it is clear it is not an attempt to circumvent the "Crop Mortgage Law." The parties entered into an agreement whereby all of the crop raised on the land was to be the appellant's crop and title to all of it was in him until the conditions of the contract had been complied with. We set this forth in the main opinion. We did not overlook the provisions of this Chapter 151 of the SL of 1933 nor the provisions of Chap 5 of SL of 1941.

Petitioner states: "If the landlord was the owner (of the crop) then the tenant had no legal or equitable interest in the crop. The landlord could sell it and the tenant would have no recourse except to sue the landlord for a money judgment on the contract and be subject to the claims of prior execution creditors or lienholders. In the event of the landlord's insolvency the tenant in such case would get nothing."

There is no such holding in the opinion. The parties agreed the crop was to be the crop of the owner of the land, that its value was to be determined as of the market value of such crops on the first day of October of the year in which delivered and the value of three-fourths of that crop was to be applied upon a certain debt. It was immaterial to the respondent whether or not the appellant sold the grain. The value of that crop on the first day of October was a payment on the note. There would be no necessity for the respondent to sue to recover the value of the three-fourths of the crop of 1942, and it would be immaterial to him that the creditors of the appellant might seize the crop. A creditor of the appellant might seize all of the crop for a debt due from him; but that would not affect the rights of the respondent. In the case at bar the debt was not paid. The respondent was not interested in the one-fourth that was to be considered payment for the use of the land or what was called rental, nor was he affected by any possible seizure of the three-fourths which was applied upon the indebtedness. It was

immaterial to respondent what the appellant did with that crop or its proceeds. A portion of the value was to be applied on his indebtedness, even if no endorsement thereof was made on the note.

Petitioner contends strenuously that the typewritten section of the contract, set forth in the opinion, "entirely varies the previous provision" with reference to ownership of the crop. He insists that the insertion of the typewritten provision shows "the landlord has abandoned his general reservation of title in the printed portion and entered into another agreement where there was no reservation of title as to this particular debt or for paying this particular debt . . . ." We do not so consider it. As noted in the opinion if there be a conflict between the printed provision of the contract and the typewritten insertion the typewritten statement prevails. This is our holding in Hagen v. Dwyer, 36 ND 346, 162 NW 699. But there is no conflict on the point urged by petitioner. The title to or ownership of the crop is fundamental to the discharge of the indebtedness. The contract, as we hold, covers more than a mere lease of land. In so far as the ownership of the crop is concerned there is no conflict between the printed provisions and the typewritten provision. The petition for rehearing is denied.

CHRISTIANSON, Ch. J., and NUESSLE, BURKE and MORRIS, JJ., concur.