[File No. 7170]

ROY H. KERN, Respondent, v. CHARLES KELNER, Appellant.

(48 NW2d 90)

Opinion filed April 3, 1951

*Torkelson & Morland,* for appellant.

*Mark Amundson,* and *Mackoff, Kellogg & Muggli,* for respondent.

CHRISTIANSON, J. This is a sequel to Kern v. Kelner, 75 ND 292, 27 NW2d 567, and Kern v. Kelner, 75 ND 703, 32 NW2d 169. The action is one for specific performance of a written contract between plaintiff and defendant.

On December 31, 1930, the plaintiff executed and delivered to the defendant his promissory note for $3000 payable on or before December 31, 1931, with interest at 8 per cent per annum. The plaintiff's father and mother signed the note with the plaintiff as makers. Owing to the financial condition of the plaintiff the defendant made little attempt to collect the note, no part thereof was paid, it was not renewed and the statute of limitations ran against suit on the note. The defendant sought to induce the plaintiff to make some payments on the note apparently so as to keep the indebtedness alive but it was not until November 30, 1940, that the parties came to an agreement. At that

time the amount due on the note (if interest were added thereto) amounted to more than $5000. On November 30, 1940, plaintiff executed and delivered to the defendant a note for $3000 due November 30, 1942, with interest at the rate of two per cent per annum payable annually. About the time this note was executed and delivered the defendant Kelner became the owner of the SW¼ of Section 4, Township 131, Range 100 in Bowman County, the land that is involved in this action. The plaintiff lived on the adjoining quarter,—NW¼ of Section 4, Twp 131, Rg 100. According to the evidence the buildings were quite close to the line between the NW¼ and the SW¼ and apparently the half-section tract has been developed as a farm unit.

"On November 28, 1941, the defendant, being the owner of the land involved, entered into a written contract with the plaintiff for the renting of this land to the plaintiff 'during the season of farming in the year 1942 and subsequent years as hereinafter provided.'"

In preparing the contract a printed form for "Farm Contract —Upon Shares," was utilized. The form contained the usual printed provisions of such contract between landlord and tenant. 75 ND 294. The form contained printed provisions that the party of the second part (Kern)

"agrees not to remove any straw or manure from said farm, and not to sell or remove, or suffer to be sold or removed, any of the produce of said farm or premises, of any kind, character, or description until the division thereof, without the written consent of the party of the first part (Kelner), and until such division the title and possession of all hay, grain, crops and produce raised, grown, or produced on said premises and the proceeds of each of the same, shall be and remain in the party of the first part (Kelner), and the said party of the first part (Kelner) has the right to take and hold enough of the crops or proceeds therefrom that would on the division of said crops or proceeds belong to the party of the second part (Kern), to repay any and all advances made to him, by the party of the first part (Kelner), and interest thereon at 6 per cent per annum, and also to pay all indebtedness due said party of the

first part (Kelner) by said party of the second part (Kern), if any there be. It is also agreed that in case said party of the second part (Kern) neglects or fails to perform any of the conditions or terms of this contract on his part to be done and performed, then said party of the first part (Kelner) is hereby authorized and empowered to enter upon said premises and take full and absolute possession of the same, and he may do and perform all things agreed to be done by the party of the second part (Kern) remaining undone, and to retain or sell sufficient of the crops raised on said premises that would otherwise belong to said second party (Kern), if he had performed the conditions thereof, to pay and satisfy all costs and expenses of every kind incurred in performing said contract, with interest at 6 per cent per annum; and the residue remaining, if any, of said crops shall belong to said party of the second part (Kern) after all conditions hereof are fulfilled."

The contract also contained certain provisions written in part or wholly with a typewriter. In order that it may be apparent what parts of a provision were printed and what was written in with the typwriter the words and provisions written with typewriter are italicized. Such provisions are as follows:

"In consideration of the faithful and diligent performance of all the stipulations of this contract by the party of the second part the party of the first part agrees, upon reasonable request thereafter made, to give and deliver on said farm, the *three fourths* of all grains, so raised and secured upon said farm during said season, *proceeds thereof to be applied as hereinafter provided: The party of the second part shall plant to wheat each year during the life of this contract ninety-three acres upon the said premises, and the remainder thereof he shall either summer fallow, or plant to corn for his own use.*

*"It is further understood and agreed between the parties that whereas the said party of the second part is indebted to the party of the first part upon a promissory note of three thousand dollars, dated the 30th day of November, A.D. 1940, with interest thereon at the rate of two per cent per annum, all of the crops to be raised by the party of the second part upon the said prem-*

*ises each year during the life of this contract shall be delivered to the order of the party of the first part at the Scranton Equity Exchange at Scranton, North Dakota; that the value thereof shall be determined as of the market price thereof on the 1st day of October of the year in which delivered, unless otherwise agreed upon by the parties hereto; and of the proceeds so to be determined, the one fourth shall be considered as rental due the party of the first part for the use of the said land, and the remaining three fourths thereof shall be applied toward the payment of the said promissory note of three thousand dollars hereinbefore mentioned and the interest thereon, until the same shall have been fully paid; and in consideration of the premises, the party of the first part hereby grants to the party of the second part an option to purchase the said premises from the party of the first part for the sum of twelve hundred fifty-eight dollars and 85 cents; which option may be exercised within one year after the said note shall have been fully paid, but not otherwise;*

*"It is further understood and agreed that in the event of the death of the party of the second part, his legal heirs shall succeed to all of his rights under and by virtue of this agreement, to be exercised pursuant to the terms and conditions hereinbefore set forth."*

It will be noted that in the printed portion of the contract it is said that "the party of the first part agrees, upon reasonable request thereafter made, to give and deliver on said farm, the *three fourths* of all grains so raised and secured upon said farm during said season." (The words "three fourths" were inserted with the typewriter in the blank space in the printed form when the contract was prepared.) The provisions of the contract which follow and which were written with the typewriter refer to the "proceeds thereof", that is, the proceeds of the grain. They further provide that "all of the crops to be raised by the party of the second part upon the said premises each year during the life of this contract shall be delivered to the order of the party of the first part at the Scranton Equity Exchange at Scranton, North Dakota; that the value thereof shall be determined as of the market price thereof on the 1st day of October

of the year in which delivered, unless otherwise agreed upon by the parties hereto; and of the proceeds so to be determined, the one fourth shall be considered as rental due the party of the first part for the use of the said land, and the remaining three fourths thereof shall be applied toward the payment of the said promissory note of three thousand dollars hereinbefore mentioned and the interest thereon, until the same shall have been fully paid." It will be noted that there is inconsistency, indeed a contradiction, between the printed provision and the subsequent provision that was inserted with the typewriter. The printed words provide for delivery of the grain on the farm. The typewritten provision refers to proceeds of the grain and provides that the grain shall be delivered to the order of the party of the first part at the Scranton Equity Exchange at Scranton, and the value of the grain without regard to the date of delivery shall be determined and fixed as of the market price thereof on the first day of October of the year in which the grain is delivered, unless otherwise agreed upon by the parties; and of the proceeds so to be determined the one-fourth shall be considered as rental due to the party of the first part for the use of the land and the remaining three-fourths thereof shall be applied toward the payment of the promissory note of $3000 and interest thereon until the same shall have been fully paid. If the grain itself was to be divided and one-fourth thereof delivered to the defendant as payment in full for rental for use of the land, then obviously the market value of the grain so delivered and received for rent would be wholly immaterial, as such one-fourth of the crop would constitute payment in full for the rent and would discharge all obligations of the plaintiff regardless of the market value of the grain and ordinarily such market value would become and be material only as a basis for measuring damages in the event there was a failure on the part of the plaintiff to make delivery of the one-fourth of the grain. So far as the note was concerned, however, a different situation was presented. The note was not payable in a quantity of grain. It was payable in money. It was at least desirable that some basis be agreed upon by the parties for determining the value of the wheat in dollars and so

the parties agreed that the market value of the wheat on the first day of October of the year in which the grain was delivered should constitute the basis for valuation of the wheat in terms of money. The Scranton Equity Exchange was a licensed warehouseman where there would be available a market price at 'all times, and where the grain might be disposed of and converted into money. The language of the contract indicates that the parties had in mind a division of the proceeds of the grain and not necessarily an actual division of the grain itself and it seems to have been the intention of the parties as evidenced by the contract that the market value as of the date fixed, namely, October 1st should be available for measuring value for any and all purposes where it might become necessary in the dealings between the parties to determine the market value.

On the day the contract was executed the plaintiff paid to the defendant $200 in cash which was credited upon the note. Sixty dollars was applied in payment of the interest and $140 was applied upon the principal thus reducing the amount of the principal to $2860. In 1942 plaintiff raised a crop of 2527 bushels and 20 pounds of wheat on the land.

"Under the terms of the contract the defendant had title to all of this grain, but it was his duty to credit three fourths of the value of said crop as determined by the price of wheat on October 1, 1942, upon the note in question unless the plaintiff owed him anything under the farming operations. There was but one item which the plaintiff owed—a hail lien mentioned later. However, the defendant had the right to retain for himself 631 bushels and 50 pounds of wheat. The title to this was in the defendant, and this grain was in fact the rent. The value of the grain on the first day of October 1942, as found by the trial court and not disputed by either party was 95¢ per bushel, . . . .

"There was no crop matured in 1943, owing to hail but the record shows the plaintiff had the crop insured against hail and there was a hail lien impressed upon the land and all of the crop to be raised in 1943, amounting to $57.60. The plaintiff admits he owed this and on the trial of the case he agreed this should be collected by the defendant out of this 1942 crop.

"Disregarding the hail debt as not an advance for the 1942 crop this would require the defendant to give the plaintiff a credit of $1801.20 approximately on the principal and interest of the note, if the plaintiff had complied with his contract in turning over to the defendant all of the crop of 1942. The defendant received but 2053 bushels at that time. He deducted one fourth of the entire crop as rent from this wheat and gave the plaintiff as credit upon the note $42.90 for interest and $1249.60 on the principal. These are defendant's endorsements on the note." Kern v. Kelner, 75 ND 295–296.

The evidence shows that when the crop of 1942 was about to be harvested the plaintiff Kern drove to Kelner's home and told him that the elevator at Scranton was not able to accept any grain at that time and that they did not know when they could and that the plaintiff then asked what he should do with the grain and that the defendant Kelner mentioned that he had a 2000 bushel bin down at his farm and said he could store it in the bin at the farm and he asked if he wanted to move it down to his place. That they talked about what they could do. That the next morning the defendant Kelner called and said that he had storage in an old flour bin in his elevator at Scranton and so both of them went down to look it over and they thought they could board up the bin so that it would hold all the grain, and later the grain when and as combined was hauled and put in the old flour bin at the elevator at Scranton; that as the bin became quite full plaintiff was afraid "it might burst" and that he stored the balance (474 bushels and 20 pounds) in a bin on his farm. The defendant Kelner went to the west coast for the winter and there was no further discussion between the parties with respect to the grain until next spring. The plaintiff Kern testified that after Kelner got back from California in the spring of 1943 he noticed Kelner's truck back of the elevator and went over and talked to him about the matter and that Kelner said maybe they ought to have settlement for the crop, but that it was a pretty busy time and they would leave it until after spring's work. Kelner testified that during August 1943 he caused the wheat that had been stored in the flour bin to be hauled to the Scranton

Equity Exchange Elevator and it was found that such wheat amounted in all to 2053 bushels. The evidence further shows that the plaintiff caused the wheat which he had stored in the granary on his farm to be hauled to Scranton and that it was found that such wheat amounted to 474 bushels and 20 pounds making the total amount of wheat produced on the land in 1942, 2527 bushels and 20 pounds.

The defendant had received only 2052 bushels of the 2527 bushels and 20 pounds of wheat that had been produced, and he deducted 631 bushels and 50 pounds from the wheat which he had received as and for the landlord's share, leaving 1421 bushels and 10 pounds. He sold this wheat in August 1943 at which time he received $1.19 a bushel for it. In applying the proceeds of the wheat he computed the price of the wheat at 95 cents per bushel, the same being the market price at Scranton on October 1, 1942. He applied $57.60 in payment of plaintiff's share of hail insurance premium, $42.90 in payment of interest on the note to October 1, 1942, and $1249.60 as payment upon the principal of the note as of October 1, 1942, thus leaving a balance remaining unpaid upon the note, after the application of said $1249.60, of $1610.40 with interest thereon after October 1, 1942, at 2 per cent per annum.

Plaintiff testified that he did not ascertain the amount of wheat that had been stored in the flour bin until November 19th or 20th, 1943. He testified that at that time he saw the defendant in Scranton and went over and talked to him. That thereafter they went over to the Scranton Equity Exchange elevator and that Mr. Kelner asked how many bushels (of the grain that had been stored in the flour bin) had been delivered at the Equity Exchange Elevator, that they were then informed that there were 2053 bushels.

The plaintiff testified that he had hauled the grain stored in the bin on his farm to Scranton a short time before and that he told the defendant that the grain which he had stored on his farm amounted to 474 bushels and 20 pounds. That the plaintiff asked if they could not make a settlement as to what the plaintiff owed, that the defendant answered, "I suppose you can but you

are only entitled to 95 cents a bushel." That the market price of the wheat on that day was $1.34 a bushel and that plaintiff contended that he was entitled to credit upon the note for the market price of the wheat on that day and that the defendant contended he was entitled to credit only at the rate of 95 cents a bushel. That thereafter and on the same day the plaintiff tendered to the defendant his three personal checks all on the First National Bank of Bowman, North Dakota; one for $473.05, one for $478.58, and one for $1258.85. According to the notations on the checks the check for $478.58 was for payment on the principal of the note, the check for $473.05 was for the balance of the principal and payment of interest on the note and the hail tax, and the check for $1258.85 was payment in full for the purchase price of the land. According to plaintiff's testimony the defendant looked at the checks and said, "I am not settling for that," and refused to accept the checks. The checks were placed on a desk for the defendant and in his presence but the defendant said that the amount was not enough and he refused to accept them. He did not refuse them on the ground that they were checks. The plaintiff then took the checks and produced them upon the trial of the action. 75 ND 297–298.

It does not appear that any further negotiations were had between the parties until in March 1945. The plaintiff farmed the land during 1944 and produced a crop thereon. No part of such crop was delivered to the defendant at Scranton or at any other place. On March 29, 1945, the plaintiff deposited to the credit of the defendant in the First National Bank of Bowman $2210.48 and thereafter served upon him a written notice reciting that such deposit had been made. (Such notice of deposit also recited that there had been delivered 118 bushels and 35 pounds of wheat at the Scranton Equity Exchange.) The notice recited that the deposit constituted payment of the note and of the purchase price of the land and demanded a conveyance by the defendant to the plaintiff of the land in question. There was no acceptance of the amount deposited and thereafter the plaintiff instituted this action for specific performance.

It was the theory of the plaintiff that the clause in the contract

reserving title to the crops in the defendant operated merely to secure to the defendant the one-fourth of the crop as rent and payment for any advances he might have made and that the reservation of title did not vest title in the defendant or create a lien to secure payment of the note and this theory was upheld by the trial court. Kern v. Kelner, 75 ND 300, 303.

On the first trial the court held that the defendant was entitled to one-fourth of the crop for rental for use of the land; but that the defendant had no right to sell any part of the remaining three-fourths of the grain and that the provision in the contract for the application thereof upon the promissory note was invalid and that the plaintiff was entitled to receive therefor $1.34 per bushel, the market price on November 20, 1943. The trial court found, however, that the amount tendered and deposited was insufficient and that consequently the note was not paid and continued to bear interest. The trial court found that it was necessary for the plaintiff to pay to the defendant $204.67 more than had been tendered and deposited and the court directed that the plaintiff might pay such sum, namely, $204.67 in court for the defendant within ten days, and that upon such payment the plaintiff would be entitled to a decree of specific performance as prayed for in his complaint. The plaintiff promptly made the deposit and the trial court made findings of fact in favor of the plaintiff and rendered judgment requiring the defendant to convey the premises to the plaintiff. The defendant appealed from the judgment and this court held that the contract between the parties was in force and effect, that under such contract the defendant was entitled to receive all the grain produced on the premises until the note has been fully paid, that the defendant was entitled to retain one-fourth of the grain so produced as the landlord's share and that he was required to apply the remaining three-fourths of the crop each year as payment upon the note at the market price on October 1st of the year in which the crop was produced and received, unless it was otherwise agreed between the parties, and that consequently the plaintiff was entitled to credit upon the note for the 1942 crop at 95 cents per bushel only, the same being the market price on October 1, 1942,

and not at $1.34 a bushel, the market price of the grain on November 20, 1943, as plaintiff claimed and as the trial court had allowed.

This court directed that the judgment appealed from be reversed and the cause remanded to the district court for further proceedings in conformity with law. After the remittitur had been transmitted to the district court and that court reinvested with jurisdiction of the case "the plaintiff moved the district court pursuant to notice for leave to file a supplemental complaint setting forth certain matters that had occurred subsequent to the rendition of the former judgment, among others, that the plaintiff had made tender of an additional sum of $2010.48; that the defendant had refused such tender and that upon such refusal the plaintiff had deposited the amount tendered to the credit of the defendant in a bank of good repute in this state. At the hearing of such motion the defendant appeared by his counsel and objected to the granting of the motion and also made a counter-motion that the trial court render judgment dismissing plaintiff's action and also dismissing defendant's counterclaim. After the hearing the trial court made an order granting plaintiff's motion for leave to file a supplemental complaint and denying defendant's motion for dismissal of the action." 75 ND 705. Thereafter the defendant appealed from such order, contending that under the decision of this court it was the duty of the trial court to render judgment for dismissal of the action. This court held that the trial court did not err in granting plaintiff permission to serve and file a supplemental complaint and held that the defendant was entitled to interpose his pleading in answer to such complaint and directed that the order granting the plaintiff permission to file a supplemental complaint be modified so as to permit the defendant, within thirty days after the filing of the remittitur in the office of the clerk of the district court to serve and file his pleading in answer to the supplemental complaint. Kern v. Kelner, 75 ND 703, 32 NW2d 169.

After the case had been remitted to the district court the de-

fendant interposed an answer to the supplemental complaint. The supplemental complaint sets forth, among other matters, that after the rendition of judgment pursuant to the order of this court on the first appeal, the plaintiff tendered to the defendant certain monies to compensate the defendant in full for all plaintiff's indebtedness and obligations under the contract and that upon the refusal of such tender the plaintiff deposited such monies to the credit of the defendant in a bank of good repute in this state and served upon the defendant notice of such deposit. The defendant in his answer to the supplemental complaint admits that the plaintiff manually offered him a certain sum of money but without a statement as to how the amount was determined and that thereafter the plaintiff deposited a certain sum of money in addition to money previously deposited in the First National Bank of Bowman. Defendant alleges that he has not accepted any part or portion of the monies so deposited and that such tender and deposit does not constitute compliance with the terms of the contract. The defendant also alleges that the plaintiff is wholly in default in performance and that the defendant on April 6, 1948, caused to be served upon the plaintiff a notice of rescission of the contract on the ground of the alleged defaults of the plaintiff in complying with the terms thereof. The case was tried upon the issues framed by these pleadings. The trial court made findings of fact in favor of the plaintiff and ordered judgment in his favor for specific performance of the contract. The defendant has appealed from the judgment and demands a trial anew in this court.

The evidence shows that on July 29th, 1947, the plaintiff tendered to the defendant the sum of $4705.00 in currency as payment in full for all amounts due to the defendant for the value of one-fourth of the crop produced on the premises during the years 1944, 1945 and 1946, for the full amount remaining unpaid on the promissory note and in payment of the full purchase price of the land. Defendant admits that such tender was made but says that he did not check the amount of money and does not

know the amount of money that was tendered. Thereafter on July 30, 1947, the plaintiff deposited in the First National Bank of Bowman, North Dakota, to the credit of the defendant the further sum of $2494.52 and in such notice of deposit it was stated that such sum together with the sum of $2210.48 deposited to the defendant's credit on March 29, 1945, makes a total amount deposited to the defendant's credit of $4705.00, the amount of the tender made July 29th, and that "this sum is tendered in full payment of that certain contract entered into by and between you and the undersigned November 28, 1941, and in full payment of that certain note made, executed and delivered by the undersigned to you, November 30, 1940, in the sum of $3000.00 with interest at 2% per annum. This sum is also in full of all rentals due you by virtue of the aforesaid contract."

The evidence shows that in addition to the deposit of $4705.00 mentioned in the notice of deposit served July 30, 1947, the plaintiff had delivered for the defendant at the Scranton Equity Exchange elevator 118 bushels and 35 pounds of wheat. The defendant admits that he received and sold this wheat and retained the proceeds thereof. The evidence does not show what the defendant received for the wheat but it does show that the price of wheat at the time it was sold was considerably in excess of the market price on October 1, 1942. By computing the price of such wheat at 95 cents per bushel, the market price on October 1, 1942, the plaintiff is in any event entitled to credit upon the note for $112.65, the market value of the wheat on October 1, 1942. The evidence also shows that in December 1945 the plaintiff deposited with the clerk of the court pursuant to the order of the court $204.67 for the defendant and that such sum still remains on deposit. The evidence further shows that the plaintiff paid taxes assessed against the land for the years 1945 and 1946 amounting to $72.55. Therefore, on July 30, 1947, the plaintiff had deposited to the credit of the defendant in the First National Bank of Bowman the sum of $4705.00. He had deposited with the clerk of the court $204.67. He was entitled to credit upon the note for $112.65 for the 118 bushels and

35 pounds of wheat and he was also entitled to credit upon his indebtedness to the defendant in the sum of $72.55 for the taxes which he had paid. On July 30, 1947, the plaintiff was indebted to the defendant as follows: The unpaid balance of the note of $1610.40 with interest thereon from October 1, 1942, according to the terms of the note. He was also indebted to the defendant for the landlord's share of the crop produced during the years 1944, 1945, and 1946.

There was introduced in evidence a statement which had been prepared by the plaintiff setting forth the amount and kind of crops produced in the years 1944, 1945, and 1946 and showing the market price of the grains during each of such years at Scranton on the first of October of each of the years. The evidence shows that in a conversation between the parties on July 29, 1947, it was mentioned that such statement or computation was not available at the time of their conversation, but that pursuant to arrangement then made the statement was left at the office of defendant's attorney and that the defendant went there and examined it. That he raised no objection to the quantities of grain or to the computations shown on such statement and did not request any further figures or ask for any clarification. The trial court found that the plaintiff had not been guilty of bad faith but had acted under an honest misinterpretation of the terms of the contract and was placed in the position where he could not deliver the specific grains that had been grown on the land in the years 1944, 1945, and 1946, and that the plaintiff might show the amount of his indebtedness and cure his default by paying to the defendant in cash the value of such one-fourth of the crop on the first of October of each of such years together with legal interest on such sums from the date on which delivery should have been made under the contract.

The evidence shows that in 1944 there was produced upon the land in question a crop of wheat and that one-fourth of the crop amounted to 482½ bushels, and that the market price thereof at the Scranton Equity Exchange on October 1, 1944, was $1.22 a bushel or $588.65 for the one-fourth of the crop. The evidence

further shows that in 1945 the plaintiff planted approximately 60 acres of wheat and 38 acres of flax and that in 1946 he planted 53 acres of wheat and 40 acres of barley. According to the evidence some of the land was infested with weeds and the condition of the land which plaintiff planted to flax and to barley was such that it was desirable the land be planted to crops other than wheat. The plaintiff further testified that he computed what the wheat yield would have been in each of such two years if the land that was seeded to flax and barley had been seeded to wheat and had produced the same amount of wheat that the land which had been so seeded produced. He computed the one-fourth share of the crop and the market value thereof on such basis. The trial court found that as so computed one-fourth of the crop in 1945 would amount to 346½ bushels of wheat and that the market price thereof on October 1, 1945, was $1.42 making the total market value of such one-fourth of the crop $492.03. That in 1946 there was produced 148½ bushels of wheat and 160 bushels of barley. That the market value of the barley was in excess of what the market value of wheat would have been if the tract which had been planted to barley was computed on the basis as though it had been planted to wheat and the defendant was given the benefit of the increased income and the trial court found that the market value of the 1946 crop on October 1, 1946, amounted in all to $481.47. The trial court found and determined that under the evidence the amount and value of one-fourth of the crop for each of such years was as so stated and to this the trial court added interest at 4 per cent per annum from October 1st of each of the years 1944, 1945, and 1946 respectively to August 1, 1947, the day following the one upon which the plaintiff made the deposit in the First National Bank of Bowman. In short, the trial court found the market value of one-fourth of the crop, the share belonging to the defendant as rental for use of the land, to be as follows:

For 1944 ........................................ $ 588.65
Interest thereon at 4 per cent per annum from October
1, 1944, to August 1, 1947 .......................... 66.71
For 1945 ........................................ 492.03
Interest thereon at 4 per cent per annum from October
1, 1945 to August 1, 1947 .......................... 36.08
For 1946 ........................................ 481.47
Interest thereon at 4 per cent per annum from October
1, 1946, to August 1, 1947 .......................... 16.05

Total market value of the one-fourth share of the crop
for the years 1944, 1945, and 1946 as of October 1st of
each of such years and with interest on the market
value of such crop from October 1st of each of such
years to August 1, 1947 ........................... $1680.99

Therefore, on July 30, 1947, the plaintiff was indebted to the
defendant:

1. The balance due on the promissory note was
$1766.08. But on this indebtedness plaintiff was
entitled to a credit of $112.65 for the 118 bushels
and 35 pounds of wheat which he delivered and
which defendant sold. Plaintiff was also entitled
to credit for $72.55, the amount which plaintiff
expended for payment of taxes on the land, mak-
ing the balance due and owing to the defendant
on July 30, 1947 ........................... $1580.88

2. For the one-fourth share of the crop for the
years 1944, 1945, and 1946 with interest thereon
from October 1st of each year up to July 30, 1947,
amounting to ............................. 1680.99

3. Upon the exercise of the option the plaintiff was
required to pay to the defendant for the land ... 1258.85

Therefore, the total sum which the plaintiff was
required to pay to the defendant on July 30, 1947,
amounted to ............................. $4520.72

As has been shown the plaintiff on July 29, 1947, tendered to the defendant $4705.00 in money and on July 30, 1947, the plaintiff deposited in the First National Bank of Bowman to the credit of the defendant certain monies which together with monies previously deposited in said bank to the credit of the defendant made a total deposit so made by the plaintiff to the credit of the defendant in said bank of $4705.00 and served upon the defendant notice of such deposit. The tender and the deposit so made were in excess of the amount for which the plaintiff then was indebted to the defendant for the balance due on the promissory note and for the amount owing to the defendant for the one-fourth share of the crop during the years 1944, 1945 and 1946 with interest upon the market value of such crops from the first day of October in the years in which the crops should have been delivered up to August 1, 1947, and for the sum of $1258.85, the amount which the plaintiff was required to pay to the defendant for the purchase price of the land upon the exercise of the option to purchase.

The contract provided: (1) for the farming of the land by the plaintiff and for delivery to the elevator for the defendant of all the crop produced each year; (2) that one-fourth of such crop should constitute rental for use of the land; (3) that the remaining three-fourths of the crop should be applied upon the note until it was paid and when the note was paid that any balance of the three-fourths of the crop should be delivered to the plaintiff; (4) that the plaintiff have an option to purchase the land for $1258.85, such option to be exercised within one year after the note shall have been fully paid; (5) that in event of the death of the plaintiff, his legal heirs shall succeed to all his rights under and by virtue of the contract. The contract should be viewed in light of the circumstances and conditions prevailing at the time it was executed. While the parties agreed upon all the provisions of the contract it is apparent that the different provisions affected the interests of the parties in different degrees. The provisions relating to the reservation of title to the crops and the delivery of the crops, the retention by the defendant of one-fourth of the crop for rental for use of the land and

the application of the remaining three-fourths to the payment of the note were inserted largely for the benefit of the defendant. The note was a renewal of an old obligation which the defendant had been unable to collect and the provisions which made all the crop, except that reserved for rental, applicable for the payment of the note was of particular interest to the defendant. The provision for the reservation of title and the delivery of the grain gave to the defendant the benefit of the grain produced for payment of the note but the note was not payable in grain. The provisions of the note remained as before. The note was payable in money and the provision of the contract with respect to the application of the wheat as payments on the note was a supplemental agreement giving to the defendant the right to have the wheat applied on the note but the note was not payable exclusively from wheat or the proceeds thereof. The provisions of the contract for the application of the wheat was not a substitute for and did not alter the provisions of the note with respect to payment but were supplementary thereto. On the one hand the defendant was not restricted to the proceeds of the wheat so that if no wheat were produced the note could not be enforced according to its terms, and on the other hand the plaintiff was not restricted in making payments on the note to the application of the proceeds of the crop. When the note had become due according to its terms the plaintiff might if he so desired pay the note in full with money and discharge the obligation thereof. The contract does not provide, and this court has not held, anything to the contrary. The provisions of the contract giving the plaintiff an option to purchase the land was one in which the plaintiff was peculiarly interested. The evidence shows that the land was so situated that it was desirable for the plaintiff to acquire it for use in connection with adjacent land which he owned or operated. In defendant's answer in this action it is alleged:

"That the tract of land involved in this action is now and at the time when the said contract was entered into was, and for many years prior thereto had been of peculiar value to the Plaintiff by reason of its location, productivity and other rea-

sons; that Plaintiff was greatly chagrined when Defendant purchased the same and importuned and entreated Defendant to permit Plaintiff to purchase the same from the Defendant for the price which Defendant paid therefor; to which said importuning and entreaties Defendant, being mindful of his former experience with the Plaintiff with respect to his said obligation, and to provide an incentive for the Plaintiff to pay his said renewal note acceded in entering into the said farm contract . . . ."

In defendant's brief on this appeal it is said:

"The land is as appears from the testimony very important to the plaintiff in his farming operations."

Plaintiff's option to purchase the land is a part of the contract. The option was supported by a valuable consideration and is more than a mere offer. 58 CJ p 976. According to its terms the option did not terminate on the death of the plaintiff but his legal heirs would succeed to all his rights under and by virtue of the agreement. When the contract is viewed in light of the conditions and circumstances prevailing at the time it was executed the option was probably an inducement to the plaintiff to agree that there be inserted in the contract and made a part thereof the stipulations relating to the delivery of all the crop and the application as payment upon the promissory note of all that remained of the crop after the deduction of the landlord's share. Simmerman v. Fort Hartford Coal Co., 310 Ky 572, 221 SW2d 442; Bacon v. Kentucky Central Ry. Co., 95 Ky 373, 383, 25 SW 747; Cleveland Wrecking Co. v. Aetna Oil Co., 287 Ky 542, 154 SW2d 31; Houghton v. Cook, 91 Vt 197, 100 Atl 115. At the time the contract was made the plaintiff paid to the defendant $200 to apply upon the promissory note and it was so applied by the defendant. The plaintiff entered upon the performance of the contract and produced a crop thereon in 1942. The defendant received one-fourth of the crop, some 631 bushels and 50 pounds, for rent, and the defendant also received and applied upon the note wheat which when valued at 95 cents a bushel, the market price on October 1, 1942, resulted in a payment upon

the note of $42.90 for interest to October 1, 1942, and $1249.60 on the principal.

Defendant's counsel contends that the plaintiff's failure to comply with the terms of the contract operates to bar him from recovery in this case. He calls attention to certain statements made in the decision written on the first appeal with respect to such defaults and contends that what is there said is decisive of the case against plaintiff's right to recover and indicates what the holding of this court "would be with reference to acts on the part of the plaintiff which he admits and which have taken place subsequent" to the first trial and which were considered by the court on the first appeal. It is true that in the decision on the first appeal attention was called to particulars in which the plaintiff had failed to perform as prescribed by the contract and that this court held that under the facts as there shown plaintiff had failed to establish the right to exercise the option; that the payment of the note was a condition precedent to the right to purchase the land under the option and that the note had not been paid. On the first appeal the question was whether there had been a compliance with the terms of the agreement so as to entitle plaintiff to exercise the option and whether it had been so exercised. What was said in the decision on that appeal had reference to the facts as they were shown by the evidence in the case and under the issues as framed by the pleadings. We were not concerned on that appeal with whether plaintiff might or could show a substantial performance so as to entitle him to specific performance nothwithstanding defaults that might exist. The members of the court were all familiar with the particulars in which the plaintiff had failed to perform as shown by the evidence and as recited in the decision. Notwithstanding such nonperformance by the plaintiff this court did not order a dismissal of the action but directed instead that the case be returned to the district court for further proceedings. If the court had been of the mind that the facts as disclosed on the first appeal were decisive and precluded the plaintiff from any relief in this action, then obviously the court would have made final disposition of the case and would not have

returned it for further proceedings and thus give the plaintiff an opportunity to make further showing by supplemental pleading and proof of such facts as might tend to establish plaintiff's right to specific performance notwithstanding any defaults that had been shown to exist. Kern v. Kelner, 75 ND 703, 32 NW2d 169.

It will be noted that the defaults of the plaintiff were all of a type that may readily be compensated in money. The failures of the plaintiff to comply with the terms of the contract and which the defendant asserts are: (1) the failure to plant all the land to be cropped with wheat during the years 1945 and 1946; and (2) the failure to deliver crops grown as prescribed by the contract.

The evidence shows that during the year 1945 the plaintiff planted a minor portion of the land with flax and that during the year 1946 he planted a minor portion to barley. The evidence also shows that during both of those years the defendant was well aware of this deviation from the contract, that he drove by the fields and observed them as they were growing, that he at no time objected, and that he at no time sought to exercise the right which he had under the contract to reenter the premises in case the plaintiff neglected or failed to perform any of the conditions or terms of the contract. The evidence wholly fails to show that the defendant was in any manner injured by this deviation but rather than he was benefited.

It is obvious that the failure of the plaintiff to deliver the grain is a breach of the contract which readily can be compensated by payment of money for the damages to the defendant. The grain was to be delivered at a certain place where there was an established market for grain. The grain had a definite market value which easily can be established and the law prescribes the measure of compensation to be allowed for the non-delivery or for the conversion thereof. NDRC 1943, 32–0323, 32–0316, 32–0304, 51–0168; 2 Sutherland on Damages, 4th ed, Sec 656, p 2309, Sec 659, p 2328; 4 Sutherland on Damages, 4th ed, Sec 1109, p 4209; 1 Sedgwick on Damages, 9th ed, Sec 244, p 495, Sec 279, p 546, Sec 279A, p 547, Sec 279B, p 547; 2 Sedg-

wick on Damages, 9th ed, Sec 734, p 1530 et seq, Sec 736, p 1539 et seq. Where there has been part performance by the plaintiff and a breach of promise by him goes only to part of the consideration and can be compensated in damages the plaintiff may recover in spite of such breach. 3 Williston on Contracts, Revised ed, Sec 841, p 2359. This principle has been recognized generally by the courts of equity as applicable where the facts otherwise justify specific performance of a contract.

In Pomeroy's Equity Jurisprudence (2 Pomeroy's Equity Jurisprudence, 5th ed, Sec 450, p 280) it is said:

"It is well settled that where the agreement secured is simply one for the payment of money, a forfeiture either of land, chattels, securities, or money, incurred by its nonperformance, will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest, and costs, if any have accrued, unless by his inequitable conduct he had debarred himself from the remedial right, or unless the remedy is prohibited, under the special circumstances of the case, by some other controlling doctrine of equity."

Gates v. Parmly, 93 Wis 294, 66 NW 253; Raddatz v. Florence Investment Co., 147 Wis 636, 133 NW 1100; Ankeny et al v. Richardson et al, 187 F 550; Houghton v. Cook, supra. This principle has been recognized and embodied in the laws of this state. NDRC 1943, Sec 32-0414 provides:

"Specific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part to the obligation of the other party, *except when his failure to perform is only partial and either entirely immaterial or capable of being fully compensated, in which case specific performance may be compelled upon full compensation being made for the default.*" (Italics supplied.)

See Sec 2346 Civil Code, Revised Codes, S. Dak, Hipple ed 1904; and Threshing Machine Co. v. Farnsworth, 28 SD 432, 440, 134 NW 819.

Of course, the equitable principle under which relief may be granted to a plaintiff notwithstanding he has breached his con-

tract does not extend to one who has been guilty of bad faith or who has intentionally or wilfully ignored or repudiated his obligations under the contract. The defendant contends that the plaintiff in this case deliberately and wilfully disregarded his obligations and wantonly failed to perform his contract. The trial court found to the contrary and we agree with the trial court. We think there is no valid basis for a contention that the plaintiff intentionally and wilfully violated the contract and failed to perform. It is true the plaintiff failed to comply with the terms of the contract, but that, as the trial court found, was not with the intention of repudiating the contract or disregarding the obligations thereunder but from a misunderstanding of what the contract provided and what the obligations of the plaintiff were under the contract. The first deviation from the terms of the contract was occasioned by facts for which the plaintiff was not responsible and which were not under his control. The contract, which the defendant had caused to be prepared, stipulated that the grain should be delivered at a certain elevator in a certain town. When the grain was ready for harvest the plaintiff learned that the elevator at which it was stipulated the grain should be delivered did not have available facilities for handling it and could not and would not accept it. Having obtained this information the plaintiff went to see the defendant to ascertain what should be done and as a result of a conference and a definite arrangement between them which incidentally caused plaintiff inconvenience and took up additional time, it was agreed that an old flour bin in defendant's private elevator at Scranton should be utilized and repaired so as to make it possible to store wheat therein and if there was not sufficient room then the balance might be stored in a granary on plaintiff's premises. This arrangement was carried out and the plaintiff stored the wheat in the old flour bin until it became quite full and he became apprehensive that "it might burst" and he then stored the balance of the wheat in a bin on his farm. No steps were taken to have the grain removed from the bins until the following year. Later that fall the defendant went to the west coast for a winter's vacation and on his return in the spring of 1943 plaintiff

contacted him with respect to a settlement for the crop and the defendant stated that it was a "pretty busy time" and suggested that they would leave it until after their spring's work had been done. In August 1943 the defendant caused the wheat that had been stored in the flour bin in his elevator to be hauled to the Scranton Equity Exchange at Scranton and it was found that such wheat amounted in all to 2053 bushels. Later that fall the plaintiff caused the wheat which he had stored in the granary on his farm to be hauled to the elevator at Scranton and it was found that the wheat so stored amounted to 474 bushels and 20 pounds making the total amount of 2527 bushels and 20 pounds of wheat that he had produced on the land in 1942. The defendant did not notify the plaintiff of the amount of wheat that he marketed which had been stored in the flour bin until November 20, 1943, when plaintiff made inquiry. At that same time the plaintiff informed the defendant of the amount of wheat that had been stored in the bin on his farm. A disagreement arose between them as to the amount of credit that should be given to the plaintiff upon the note for the grain that had been stored in the flour bin and which the defendant had sold in August 1943. It will be noticed that the contract specified that the value of the grain should be fixed as of the first day of October in the year in which the grain was *delivered*. Because of circumstances already alluded to the grain was not in fact actually delivered at the place stipulated in 1942 and was not so delivered until in August 1943. The plaintiff contended that according to the contract the value of the grain should be fixed as of "the first day of October of the year in which (the grain was) delivered, unless otherwise agreed upon by the parties" and that as this grain was delivered in 1943 the market price should be determined as of that year. On November 20, 1943, the plaintiff computed his indebtedness to the defendant and tendered certain checks which according to his computation would pay his entire indebtedness to the defendant. He computed the price of the wheat as of the day on which the offer was made, namely, November 20, 1943. The defendant refused to accept the tender stating that the amount was insufficient, and so far as the record shows that was the only

objection made to the tender. In the construction of the provisions of the contract and in the computations made thereunder the plaintiff was guided by and followed the advice of his counsel and while the plaintiff was in error in his computations, as this court later determined, his actions did not evidence any intention to repudiate or disregard the contract or refuse to perform his obligations thereunder but showed rather an intention by the plaintiff to comply with the contract and fulfill his obligations thereunder as he understood them to be. And in view of the expression in the contract that the value should be determined as of October 1st of the year in which the grain was *delivered* it can hardly be said that there was not some basis for plaintiff's contention that the year 1943 should control the market price rather than 1942, even though the plaintiff was in error in this view. The plaintiff farmed the land in 1942, he furnished the seed and performed the work and when it was found that the warehouseman to whom it was stipulated the grain should be delivered was unable to receive it the plaintiff went to see the defendant and conferred with him. This entailed extra labor and inconvenience for the plaintiff and evidenced his good faith and willingness to perform even though it became necessary to perform additional labor. As a result of plaintiff's work and the seed which he furnished the defendant received 631 bushels and 50 pounds of wheat as rental for the land which he sold for $1.19 a bushel. He also received 1421 bushels and 10 pounds of wheat which he sold in August 1943 for $1.19 a bushel and the value of which he computed at 95 cents per bushel, the market value thereof at Scranton on October 1, 1942, making the market value of such wheat $1350.10. The defendant applied $57.60 of this in liquidation of plaintiff's share of the hail insurance premium, $42.90 in payment of interest upon the $3000 note to October 1, 1942, and $1249.60 as payment upon the principal of the note as of October 1, 1942.

In a memorandum opinion the trial court expressed the view that when the plaintiff in November 1943 attempted to make settlement with the defendant and tendered him certain checks he "honestly thought that the sum offered constituted payment

in full of the note and for the purchase price of the land." In March 1945 the plaintiff again tendered payment to the defendant and followed this by a deposit of the amount tendered in a bank of good repute. The tender was refused by the defendant and in May 1945 the plaintiff instituted this action for specific performance. The trial court sustained the contentions of the plaintiff as to the meaning and effect of the provisions of the contract but found that the amount tendered by the plaintiff was insufficient and held that the plaintiff was indebted to the defendant in the sum of $204.67 more than the amount tendered and directed that the plaintiff make deposit of that amount with the clerk of the district court within ten days. The plaintiff made the prescribed deposit and the court rendered judgment for specific performance as prayed for in the complaint. Such judgment was rendered in December 1945. The defendant appealed from the judgment and as has been shown this court reversed the judgment and held that the construction that had been placed upon the provisions of the contract by the trial court was incorrect and remitted the case to the district court for further proceedings. The decision of this court became final on May 28, 1947, and the cause was thereafter remitted to the district court and that court invested with jurisdiction. Thereafter on July 29, 1947, the plaintiff again made a tender of $4705.00 to the defendant and this was followed by a deposit of the monies tendered so that, on and after July 30, 1947, there was and remained on deposit to the credit of the defendant in the First National Bank of Bowman the sum of $4705.00. Upon the trial, the plaintiff further stated that if the amount tendered and deposited should prove insufficient that he was ready and willing to make any additional payment that the court might order. The trial court found, and with this we agree, that the plaintiff actually tendered and deposited to the credit of the defendant a sum in excess of the amount required to compensate the defendant for all claims under the contract including compensation for damages for the failure of the plaintiff to comply with certain provisions of the contract and including, also, payment of the purchase price of the land. Obviously the plaintiff was justified in

relying upon the correctness of the decision of the trial court and the judgment that was rendered by it in December 1945 as long as that judgment remained in force, and when that judgment was reversed by this court and the plaintiff was informed that the construction which his counsel, and which the trial court, had placed upon the provisions of the contract was erroneous he at once proceeded to make every reasonable effort to substantially perform and comply with the contract by offering compensation to the defendant for the damages which under the law the defendant was entitled to recover for the particulars in which the plaintiff had failed to comply with the contract. On July 29, 1947, the plaintiff again made tender to the defendant of monies which according to his computations would compensate the defendant for all claims which he would be entitled to recover under the terms of the contract as construed by this court and for all damages that defendant might have sustained on account of the failure of the plaintiff to comply with certain provisions of the contract, and such tender was immediately followed by a deposit of the monies to the credit of the defendant in the First National Bank of Bowman, which deposit as the trial court held and as we hold was more than sufficient to compensate the defendant for all sums coming to him under the contract including compensation for damages which defendant was entitled to recover for the failure of the plaintiff to comply with certain provisions of the contract.

The defendant seeks a forfeiture of the option to purchase and of all the rights of the plaintiff thereunder. It is apparent from the facts established by the evidence and by the admission in defendant's answer and in his brief on this appeal quoted above that the forfeiture of the option would greatly prejudice the plaintiff. Manifestly, it would be unjust to forfeit plaintiff's option and deprive him of opportunity to make substantial performance of the contract by compensating the defendant for the particulars in which the plaintiff failed to comply with the contract. For reasons already set forth we do not believe that the plaintiff acted in bad faith or that he wilfully or intentionally

sought to repudiate or disregard his contract but rather that he sought in good faith to comply with the provisions of the contract and to perform his obligations thereunder as he understood them, that he acted in the first instance upon the advice of his counsel and later upon the judgment of the trial court. That after such judgment was reversed and he learned that the construction which his counsel had placed upon his contract and which the trial court placed upon it was erroneous he at once proceeded to make every reasonable effort to substantially perform the contract as construed by this court by offering compensation in money to the defendant for the damages to which he would be entitled under the law for the particulars in which the plaintiff had failed to comply with the contract.

The defendant also contends that he was damaged by the acts and omissions of the plaintiff in particulars for which no adequate compensation has been offered or made or can be made. This contention, we think, is untenable. As has been pointed out the material defaults of the plaintiff consisted in failing to deliver grain in accordance with the provisions of the contract; and the failure to deliver grain or the conversion of grain are acts for which the injured party may readily be compensated in damages. There is no claim that the grain produced was of a particular variety which gave it added value. Under the contract the value of the grain was to be computed at the general market value as of October 1st in the year in which the grain was delivered. As a result of the erroneous construction placed upon the contract and the miscalculation made by the plaintiff, which resulted in the tender of an insufficient amount in the fall of 1943, the defendant became entitled to the landlord's share of the crop as rent for the years 1944, 1945, and 1946 and in the judgment rendered by the trial court and by the judgment which will be rendered pursuant to the decision of this court the defendant is being so compensated for such rent. If it had not been for the misconstruction and the erroneous calculation and if the plaintiff had delivered to the defendant all the wheat produced in 1944, the proceeds of such wheat based upon the

market price on October 1, 1944, and after deducting the landlord's one-fourth of the crop for rent, would have paid the entire balance remaining on the note and left a substantial amount belonging to the plaintiff. The plaintiff might then have exercised the option as he presumptively would have done as it would have been to his interest to do so and as he had already attempted to do in the fall of 1943. If this had been done, the defendant would not have been entitled to receive any rent for the years 1945 and 1946 which he will receive under the judgment rendered by the trial court and the judgment which will be rendered pursuant to the decision of this court. So, from a financial standpoint the defendant has not been injured but has actually benefited by the failure of the plaintiff to comply with the contract in 1944.

In defendant's answer to the supplemental complaint it is alleged that on April 6, 1948, the defendant caused to be served upon the plaintiff a written notice of rescission of the contract. The grounds set forth in the notice of rescission relate to the failure of the plaintiff to comply with the contract in the particulars already alluded to. The trial court found that the plaintiff by the tender, followed by the deposit on July 30, 1947, had done everything possible in the circumstances to substantially perform the contract by tendering and making payment for all sums coming to the defendant, including damages sustained by the defendant by reason of noncompliance by the plaintiff of certain provisions of the contract and that consequently the notice of rescission served more than eight months thereafter was unavailing. We agree with this holding of the trial court. The tender and deposit clearly operated as payment of the note. NDRC 1943, 9-1224, 9-1225; Ugland v. Farmers & Mechanics State Bank, 23 ND 536, 547, 237 NW 572. It also notified the defendant of plaintiff's election to exercise the option as well as plaintiff's willingness and ability to discharge all obligations under the contract coupled with the deposit to the credit of the defendant in a bank of good repute in the State of all sums to which the defendant was entitled. Consequently the relationship of landlord and tenant under the contract ceased and the relationship of

vendor and purchaser arose. Gassert v. Anderson et al, 201 Minn 515, 276 NW 808.

Defendant also contends that at the time the tender was made followed by the deposit on July 30, 1947, the farm contract was in effect and the grain was ripe and that in any event the defendant is entitled to payment of rent for the year 1947. The plaintiff testified that the grain was not ripe but was growing and green at the time. There was no evidence whatsoever offered to the contrary and the trial court held that on July 30, 1947, the grain was green and growing and was a part of the realty and upon the exercise of the option the growing grain went with the land and title thereto vested in the plaintiff. Tanous v. Tracy, 55 ND 100, 212 NW 521. We agree with this holding of the trial court.

As has been pointed out the plaintiff tendered to the defendant and caused to be deposited to his credit in the First National Bank of Bowman monies which, when the last deposit was made on July 30, 1947, amounted to $4705.00. This was in excess of the amount which the plaintiff was obliged to pay in order to fulfill his obligations under the contract and compensate the defendant for any and all damages which he might have sustained by failure of the defendant to comply with all the provisions of the contract. The amount required to discharge such obligations on July 30, 1947, amounted to $4520.72. In other words, plaintiff deposited $184.28 in excess of the amount required. The amount so deposited by the plaintiff in excess of the amount required to compensate the defendant should be returned to the plaintiff. The plaintiff also deposited $204.67 in open court on the first trial. This deposit should also be returned to the plaintiff.

The trial court was correct in rendering judgment for specific performance of the agreement for the purchase of the land, and such judgment should be affirmed. In certain other particulars some changes should be made in the judgment, and in order that there may be no uncertainty in the matter the trial court is directed to enter a new judgment, in substance as follows:

That the sum of $4705.00 which the plaintiff deposited to the

credit of the defendant in the First National Bank of Bowman belongs to the defendant, but that he is ordered to return and pay to the plaintiff the sum of $184.28 thereof as hereinafter ordered.

That the defendant shall not withdraw any of the monies so on deposit in said bank to his credit until he has executed and delivered to the plaintiff a good and sufficient deed conveying to the plaintiff the premises involved in this action as hereinafter ordered.

That the defendant is ordered and directed to pay to the plaintiff within twenty (20) days after the service of the notice of entry of judgment in the above entitled action, the sum of $184.28, such being the amount which the plaintiff tendered to the defendant and deposited to his credit in the First National Bank of Bowman in excess of the amount which the plaintiff was required to pay to the defendant in discharge of all obligations under the contract, including the amount due on the promissory note and the amount of the purchase price of the land.

That the sum of $204.67 deposited by the plaintiff with the clerk of the district court in December 1945 belongs to the plaintiff and that the clerk of the district court is directed to return the same to the plaintiff.

That the defendant is ordered and directed to deliver to the plaintiff within fifteen days after service of notice of entry of judgment in this action the promissory note for $3000.00, dated Nov. 30, 1940, and payable Nov. 30, 1942, executed by the plaintiff to the defendant, and described in the farm contract and in the complaint.

That the defendant is ordered and directed to execute and deliver to the plaintiff within 15 days after service of notice of entry of judgment in this action a good and sufficient deed conveying to the plaintiff the premises involved in this action, to-wit the following described premises lying and being in the County of Bowman and State of North Dakota, and described as follows, to-wit:

The Southwest Quarter (SW¼) of Section Four (4), in Township One Hundred Thirty-one (131), North, Range One Hundred

(100), West of the 5th P.M. containing 160 acres, more or less, according to the U. S. Government Survey thereof.

MORRIS, C. J., and GRIMSON and BURKE, JJ., concur.

SATHRE, J., did not participate.